Good morning, Your Honors. May it please the Court, General Murphy appearing for Plaintiffs and Petitioners, Raymond Reudy and Kevin Hicks. Your Honors, we're here to discuss the interpretation of Civil Code Section 1717, and note first that only Does it make? Why do we need to be concerned about 1717? We have a specific document here, a specific agreement the parties made. Why do we care about 1717, whether the judge below or the magistrate judge got it right or not? You have an agreement here. We do. 1717 doesn't provide for the scope of the attorney's fees that can be recovered by the prevailing party. The scope is determined by the fee provision itself. And there are two strains of cases that have been presented to this Court. There's the Thompson-Sandesa strain, which are broad in scope. They refer to any litigation, any action. As compared to the Gill v. Monsanto strain of cases, which refers to any action to enforce a contract. And we would submit that an action to enforce a contract is limited to actions to enforce a contract. It is not broad enough to include any action to enforce a contract. It is not broad enough to support the action. Right? In Thompson? I don't believe so in this case. It talked about a dispute was the word, dispute. Right? Any dispute. Right? Any dispute under this agreement. Right. And the Court said that that's sufficient. Right? The lower court said that, yes. And in Gill, we had a different scenario where there was language that was very specific there that was the subject of Gill. I mean, so we're not really concerned about that. There's nothing inconsistent about Thompson v. Gill in respect to our case. We look at the language. Right? Well, we do, Your Honor. And if you look at the language in our case, it's precisely the same as the language in Gill. I don't think it is. Well, Your Honor, in our case it says if either party, which is the case in Thompson, is found in default of this agreement and so on, that the default of this agreement isn't the best language. You're not there yet. It requires an action under Gill. And this provision, too, likewise requires an action. But you have here in the release. You didn't draft the release. You would have done a better job, I'm sure. But it's clear that the parties were concerned about not having any suit that was similar to the then-pending suit against Clear Channel Outdoor for unfair competition and business practices. That's what they wanted to protect themselves again. And nonetheless, this is exactly what materialized. I don't understand in light of that specific language in the release how you can, you know, make a plausible argument that the release, you know, buys counsel fees here. That's why I started with 1717. 1717 provides for costs. The cost provision is narrow. The Court is now referring to a covenant in the contract. The release is a covenant. It stands apart from, it's a separate basis for fees than the legal cost provision. The legal cost provision flows from 1717. The provision the Court's now referring to is a provision that provides for damages upon the breach. Had there been an action to enforce the contract and a judgment for damages, then that provision, the release covenant, would have been invoked and fees could be recovered. That didn't happen here. That's my point. I have no idea what you just said. I'm sorry, Your Honor? I have no idea what you just said. I was going to say, what did you just say? There's a distinction. Yeah. What did you just argue? I don't know what you just said. There's a distinction between fees recovered under the release. Any fees recovered under the release would have to arise from an action for the breach of that covenant. That's different than fees awarded under 1717 as costs. 1717 covers contracts only, right? It does. We're not talking about contracts here. We're talking about a default of a lease of a release agreement here. What does that have to do with contract under 1717? The release agreement was offered as a bar. It was not the result of an action to enforce a breach of that covenant. I mean, your position is that they have to bring another lawsuit to recover these fees. They do. They should have brought it during this case because it's a compulsory lawsuit. It should have been brought at the same time that the motion to dismiss was filed to preserve the right. Why isn't this a silly argument? Sorry, Your Honor? Why isn't this a silly argument? Because the compulsory cross-complaint doctrine is a legitimate doctrine. It should have been invoked here because they need to recover damages under this clause. It had to be in the same lawsuit, right? Correct. And what you're saying is they had to, what, file amend the complaint as opposed to making a motion for fees? They should have filed the wrong piece of paper? No, they should have filed an affirmative action because that's what the provision says, any damage or consulting. What difference does it make? They've put the matter before the court. What difference does it make if it was filed as a, I guess it would be a counterclaim or a cross-claim? It would be a counterclaim. What difference would it make? Was there any substitute difference? I mean, they brought the matter before the court. I don't understand why this is the most argument you can make with a straight face. The procedural platform note that we stand on right now does not provide for an award of attorney's fees for them because they did not file the required action to enforce the action, to enforce this covenant, to get an award for damages. That's your argument? It is. Okay. Thank you. Thank you. Your Honors, my name is Anthony Leonis, and I represent Appellee Patrick Roach. How are you, Mr. Leonis? Very good. Have you been listening? I have been listening. Anything you heard today that you think is not adequately covered in your brief? I do not, Your Honors. Thank you. Thank you. The case is argued. We'll stand some minutes. We'll next hear argument in Garland v. Tiltware. Good morning, Your Honors. May I please the Court? My name is James Cole from Howard & Howard Attorneys. I represent the appellant and the petitioner, Cyclona Gowan. I request two minutes of my time for rebuttal. You have whatever is left on your clock there unless you have a red light there, and then you're on negative numbers. Thank you, Your Honor. This case stems from Ms. Gowan's claims that she was promised a 1 percent interest in Tiltware LLC and Full Tilt Poker, and that that promise was not honored. The promise, the promise. Yes. And when I say promise, I don't mean alleged promise because it's all allegations, but we'll skip the alleged to save where we are here. The promise was made in 2007. When was the promise made? The promise was made in the series of meetings and telephone calls that she had with Mr. Bitar and Mr. Lederer prior to the meeting in the Golden Nugget. The 2007 is when she found out that she was not received. I'm sorry. She filed a lawsuit in 2007. No. I'm sorry to cut you off, Your Honor. She filed a lawsuit in 2008. It was in the spring of 2007 when she was with her compatriots, the other members of the team Full Tilt Poker. When she discovered. Correct. Okay. So I'm sorry. So just to make sure I understand the sequence. When does she claim the promise was made? In 2004, I believe it is, Your Honor. 2004. Yes. And at that point she was told, according to your client, that she would get a 1% interest in the business. Correct. Yes. But there were no documents? No. Nothing was put in writing? No. She didn't get any share certificates? Nothing of that sort at all, Your Honor. As is set forth in the complaint, there was a meeting of all the members of Team Full Tilt, which was the other professional poker players. And she knew all that, right? She knew that she hadn't gotten anything in writing and she hadn't gotten a certificate or anything like that. Yes. She asked for it. That's part of the complaint. She then sues in 2008. Correct, Your Honor. Why is she barred by the statute of limitations? She's not barred by the statute of limitations because the understanding that she has is that this is a startup company and that the monies that she's to receive from the company are distributions when it becomes profitable. This is not a ---- To say she's going to get any money. That's a valid point. The company could have ---- I mean, as far as I know, the agreement that you allege, I can't tell she's going to get anything. She's going to get 1% of something. Who's to say she's going to get any money? That was her understanding is that ---- Her understanding from what? What did the defendant say that gave her any understanding? Then you can come back to Judge Kaczynski's question because I think it's a very good one. Here's a person who has a 1% of something. If she thinks it's a corporation, she should have got some stock. Why didn't she file a suit sooner? If it's supposed to be profits, she's supposed to get profits. Why didn't she file a suit sooner? I understood, Your Honor. We don't know what she's supposed to get. Now, I hate to interrupt you, but it didn't seem to me you were answering his question. I was attempting to, and it's kind of a convoluted case. She asked for those items and was expressly told by Mr. Bitar and Mr. Lederer that we are not going to put anything in paper because there is an issue with potential law enforcement coming down. It wasn't clear that this was going to be accepted by the government to be an okay thing to do. So everybody at that meeting said, okay, we will band together as Team Full Tilt Poker. We're going to build this Full Tilt Poker website where people play poker. And I believe now it's the number two website in the whole world. But that was the agreement, nothing in writing. Did anybody get anything in writing, any of the other poker players? None. And that's the nature of poker players is that they're like small-town gentlemen. They do things on handshakes. And it's an allegation in a complaint that specifically addresses that because you're dealing with gambling, it's a gray area, and they prefer not to put anything in writing. I think that's in a complaint, right? Absolutely correct. Let me share with you this. I have the pleasure of being allowed to sit here as a visiting judge from Brooklyn, and I'm a district court judge. This is the type of case that has aged me. When I see cases like this, you know, it's like torture to the district court judge, first amended complaint, second amended complaint, third amended complaint, every conceivable claim thrown up against the wall. And it's exactly the type of case that, from my perspective, is fraught with peril because it's almost impossible to sort all these different claims out. And, you know, I don't think you were a lawyer to begin with here. You didn't prepare this complaint, did you? The original complaint was, excuse me, prepared by one of my partners. Is he one of the poker players? No. He is not. I don't believe we have any professional poker players in the office. I'll be fair. I'll be fair. What my colleague is explaining to you about what happens in New York is the same thing I would be saying in Idaho. Same kind of stuff. Understood. It's dangerous, too. Understood. And, you know, we came here from Nevada. The problem that we have with this case is the fact that the district court judge said from the bench, I'm going to hold you to a Rule 9 standard, not a Rule 8 standard, but a Rule 9. And he specifically said that at the first hearing. That only applies to the fraud claim, I guess, right? I'm sorry? That only applies to the fraud claim, I guess, right? But his statement was, and I'll just read it, the problem with your complaint, you don't have a requirement, of course, to plead like under Rule 9, but to avoid a motion to dismiss on the pleadings, you do. That's what the district court judge applied in this case. And that's the wrong standard. So you're saying basically it's sufficient to say I was promised a 1 percent ownership interest in Tiltware, and that's plausible under the permissive pleading standards that we have to apply when we're dealing with a 12b6 motion, right? That's correct. And under Iqbal and under Ashcroft, we have to have facts that plausibly suggest a claim. And that's what we have here. You have to have facts. Let me ask you a question. Is the fact that you pled a different 1 percent interest every time you pled it, do they give any idea that you don't know what you got? The problem we had with the district court was a very hostile bench. And, well, I was worried about that. For good reason. I'd be hostile, too, if I had to deal with this. I mean, I worried. I mean, if I knew what the – if there was a deal put together, why would I add every time I allege something, why would I allege something different? I mean, I allege 1 percent of something, and then I have a second complaint, and I allege something else, and then I have a third complaint, and I allege something else. None of them the same. And part of that was because of the rulings of the court dismissing out various parties, saying that you can't even plead against, well, certain parties. The first and the second wasn't that way. I can understand when you get to the third, but the first and the second even changed. No. I don't mean to disagree with the Honor, but the court stated that we were not allowed to plead against the individuals between the first and the second, and we were not allowed – I'm sorry, between the one that actually went to hearing, which would be the second amended complaint, and then the court also stated that we could not plead against foreign corporations on the contract claim. So we had an order from the court. We did not want to let those people out. We did not want to let the corporations out, but we couldn't – we couldn't But you've been consistent with your 1 percent ownership claim against Tiltware throughout. That's correct. And the problem that occurred is Ms. Gallen relied on the representations, but the initial conversations were this is Full Tilt Poker. And then at the meeting, at the Golden Nugget meeting, Full Tilt Poker apparently, according to the defendants, is not an actual entity. It's a brand name, and that's the brand name for the website. And so the actual owner is Tiltware LLC. So that's – that's where there's a little bit of confusion on her part, but everybody is told that, and all of the other members of Team Full Tilt agree to that, and they ratify that agreement at that meeting and go forward. Well, let me get back to my original question about the statute of limitations, because I don't think I ever got a complete answer to it. So she claims that in 2004 she was told you are getting a piece of the company. Correct. And she's also told, but we're not going to put anything in writing for these legal reasons or illegal reasons or good or bad reasons, right? Seems like a little bit of a Ponzi scheme, right? Well, it wouldn't cost money. This is not entirely legal. That's why we're not going to put anything in writing. But anyway, whatever it is, she – and she doesn't, in fact – so she believes what? That she has, in fact, gotten a piece of the company? That's correct, Your Honor. So she believes there has been a transfer of the company to her, even though it's not in writing. And I believe all of the other members of Team Phil Till believe that as well. I understand, but I don't want to hear about the other members of the team. And I don't understand why a yes or a no is not a good enough answer. I apologize. All you're going to do is distract me from getting to the question I want to ask, and then when I get back at the conference, I'm not going to have your answer, and I'm going to go against you because I don't know what your answer is. Okay? So can we start this again and just listen to what I'm asking and answer my questions? Yes. Can we do that? Yes. Okay. So she is told you are getting a piece of the company, but you're not going to get it in writing for these reasons, right? That's correct. That's what's alleged. Now, doesn't that right there violate the statute of frauds? No, Your Honor. Okay. Why is that? My answer is going to be slightly long, and I apologize. No, I don't mind as long as you're not going to tell me about other people involved. Just tell me why this. Can you transfer? This is governed by Nevada law? This was happening in Nevada, right? The meeting happened in Nevada. It's a California corporation. Okay, so I don't know if there's any difference, but under state law. Yes. What other applicable state laws? Can you transfer shares to a company by oral agreement? You can, Your Honor. And to be precise, it's a membership interest in a limited liability company. Excuse me? To be precise, it's a membership interest in a limited liability company. I don't know what that is. Is that a corporation? Is that a partnership? It's a limited liability company. It is taxed like a partnership, but it is hardened for liability purposes like a corporation. It's an entity created by state law. Yes. Okay. I understand. So what are the shares in that? How do you become a part owner of that company? You have a membership interest. No. That's status. You have something. How do you become it? You are. Does somebody give you a piece of paper? Do you get a share certificate? Do you have an agreement? How do you become? You know your partner in law firm, right? Okay. How did you become a partner in law firm? There is a... Partnership agreement that you and your partner signed. Yes. Okay. That's how you became it. That's correct. How do you become a shareholder, member, whatever you call it, on one of these companies? You can sign a document. No, no. How do you do it? In my normal practice, there is an operating agreement that is prepared, but they are not required under state law, but they are normally prepared, and the members sign the operating agreement. That is normal practice. Okay. But it's not... Is there any... I don't believe you can have a... Can you have a... Oil partnership agreement? I guess you can. Yes. You can have an oil partnership. Yes, you can. So your position is that you can have, under state law, you can have a membership in this company by oil agreement. Correct. And couple that with her performance. If I understand correctly, the way a partnership works is if you have an oil agreement, you have to have all the partners on the agreement. You can't have one partner be... And who are the partners here? Who are the members here who agreed? The other members of Team Full Tilt, and we believe there are some others, including Mr. Bitar, who is not a member of Team Full Tilt. But that's what the purpose of that Golden Nugget meeting was. Everybody was brought together and told, this is what we're going to do. We're launching this website. We're going to... And when was this meeting? This meeting was in 2004, before the World Series of Poker. And so everybody who was a member or, what do you call it, a partner in this enterprise was there at this meeting? I believe so, yes. And the breach happened... I'm sorry. I just wonder, when did the breach happen? In 2007, is that your claim? That's when the other members of the entity started receiving profit distributions from Tiltware. That's the first time she knew she was not going to be part of the group here and that they were not going to honor the agreement with her? That's correct. Before then, she was touring with them. She was held out with them. She was on the website. They were all part of Team Full Tilt. This was literally like a rock star tour, where they went out and played poker with people around the world as Team Full Tilt. They didn't want her to be part of the team, and she didn't know about that until 2007? Until the money came in. That's when, all of a sudden, she got squeezed out on the deal. And we don't understand why she was singled out and told, notwithstanding the fact you've promoted this thing for five years... Your claim here that she was offered and turned down $250,000, that's in the pleading as well? That's correct. And was that at the same time in 2007? That was after she started making demands for her distributions. That's correct. Okay. You've got 15 seconds left. I'd like to save that for rebuttal, if I could. Okay. So this is a very broad type of oral understanding. We've discussed that with your adversary. But why doesn't it come under the umbrella of 12b-6? It's a very liberal pleading standard. We know that. Is this not plausible under Iqbal? I mean, how do you just respond to that? There are some cases where ambiguity doesn't necessarily mean that it's not a sufficient pleading. And we have discovery to flush out all the details. So why is this not a sufficient allegation? Because under California law, Your Honor, all material terms of a contract must be alleged in a complaint. And that's clear. And so the question is not whether they had reached agreement on some terms, but did they reach agreement on all material terms? Every term that's part of a contract has to be alleged in a pleading in order to satisfy 12b-6 standards? Not every term, Your Honor. Every material term. And there are numerous cases I would refer the Court to. But what's missing here? This seems to be material. I want a 1 percent interest in your business. Well, she says – well, two answers, Your Honor. First, she doesn't specify all of her obligations under the agreement. She says specifically in all of her complaints, she says, I was obligated to appear at this tournament, play on the website, among other things. She also says – She's going to be part of the team. I think that's obviously what comes out of the pleading. She was supposed to be part of the team. And she was going to get 1 percent take for her participation. Why is that indefinite? Why isn't that sufficient? She's going to use her name. They're going to use her likeness. She's going to wear their T-shirt when she plays poker. I mean, I don't – you know, how much more specific do you want to get? I mean, what else? Well, she would need to describe what exactly she gets in return, the entirety of her – She gets 1 percent of the business. Well, she has said variously she gets 1 percent in either tiltware or full tilt poker generically. She has not said what that means. She has said she gets distributions based on – I made some understanding. She says, you know, I don't know exactly what it was called, but I was told there's a business here and I get 1 percent. I – Well, Your Honor, California – What's so hard about that? Well, because California law says quite clearly that you can't leave the manner and method of compensation, for example, up in the air. You have to specify. She says, she says, I get 1 percent. That's the manner of compensation. That's the method of compensation is I get 1 percent. Well, if she – if her argument is that she got 1 percent of the interest in tiltware, let's say that's one of the allegations in one of the earlier versions of the complaint, and she alleged further that she got that instantly, well, then she has a statute of limitations problem because that promise was fulfilled. And yet she didn't – the breach – Her claim is that she got it. They were there in a room together. They all agreed to it. She got it at that point, so there was no breach at that point. There was a breach later on when they welched on paying her dividends or her distributions. Well, no, Your Honor. She's also alleged that she was excluded from the corporate affairs as an owner, a purported owner of the enterprise. And that happened – there is no allegation in her complaint of anything between May of 2004 and then 2007 when she says that she was – she learned others were being paid. So she was frozen out. She complains about being frozen out of the corporation, but she was frozen out. And when does she say she was frozen out? I'm pardon me? When does she say she was frozen out? Well, presumably – No, no. Not presumably. There is no allegation. What you want to say is she alleges this, and therefore she's out of the statute of limitation, and this date is way back beyond, okay, before the statute of limitation, you know, back more than the period of the statute of limitation. So which date? Which date was she frozen out? According to every allegation in her complaint, she was denied any opportunity to participate in the corporate affairs. And, again, this – if I could back up to where my adversary's argument left off. No, no. What you say, she was frozen out. Does something happen affirmatively where all of a sudden, you know, she's frozen out? The definition of being frozen out is nothing happens, Your Honor. She does not get any shares. And what date does she allege that it happened? She alleges that she was never allowed to participate in the corporate affairs. And I think that is one thing that's consistent throughout the complaint, is that she says, I had these conversations in 04, and then in 07 I learned about other people getting paid, and I never did. No, no, no. You buy shares in a corporation, and you might not get a proxy statement for a year, for example. You don't think you're frozen out. You just think, well, there hasn't been a shareholder's meeting. But if you don't get one for three years, in this case. So you need to find the date. So saying, oh, she never has. Well, then it would be no later than a year from the court. Why a year? Because LLCs under California law are required to file periodic statements with the board. And if I could go back to one of your questions. So she's supposed to know the law in California and realize, tick, tick, tick, a year has passed, I haven't been invited to a meeting. That's why I'm frozen out. Yes, Your Honor. That's the statute of repose imposes some obligations to find out, you know. I think I'm an owner. This is 12b-6. Isn't it best to flush all this out in a summary judgment motion when the facts are more developed so some of these uncertainties can be developed? That's sort of a rhetorical question. May I, with the permission of my colleagues, move on to a couple of other things? We have 743 million claims here. Yes, Your Honor. And there are a couple of others that sort of stick in my wicket a little bit, if you can tolerate my asking you about a few of them. Why is there not a sufficient pleading here to satisfy a claim for unjust enrichment? That begins with the assumption that there is no contract. So you cannot have them simultaneously. But you plead in the alternative. Correct. If you were to find there's no contract, you can say there's unjust enrichment. We do that all the time. In order to have – I just want to make sure that premise is clear because I think that it becomes relevant to the answer. In order to have a valid claim for unjust enrichment, you have to allege an allegation that you expect compensation. And here she's alleged, I started doing this in 2004 and I didn't get any payment and then I decided in 2008 to make a demand by filing suit. It's not – there's no allegation that would be a plausible basis for a request for additional compensation if you've done something. Just a minute. There's a promise. The promise is she's going to get 1 percent. She never gets it. Well, yes, Your Honor. So it seems to me that that's unjust enrichment. Well, that's why I started with the premise that you can't have contract and unjust enrichment. Well, we're not talking about contract. Yes. We're not talking about putting her in the contract. We're saying if there is no contract, because it was indefinite, because there was not definite in essential terms, we nonetheless have a promise here. I'm going to get 1 percent. And if that is not a – if that is not a contract, if we can't put a contract together, then unjust enrichment will give us something when we don't have that. And it seems to me that's where we are. If we don't have a contract, unjust enrichment is the alternative. That is the next alternative argument, Your Honor, but I don't think that you can say, well, there's no enforceable promise, but I'm going to use those, the unenforceable promise to create an enforceable obligation. Well, just a minute. Just a minute. Unjust enrichment has a promise. It doesn't have to have any more than a promise. If she had a promise, I'll get 1 percent, that is the promise. And, Your Honor, if I could – that's an extraordinarily important point, and I want to make sure I don't miss the opportunity to explain why the 1 percent number does not hold up there. In Maglica, this case by the California Court of Appeals, the Court explained very clearly the distinction between contract damages and unjust enrichment damages. And it says, well, if you have an – they're an unenforceable agreement, an alleged agreement that wasn't a contract for an equity stake in the enterprise, and the Court affirmed the conclusion that there was no contract. And it said, therefore, I cannot give you what you thought you bargained for under an unenforceable contract. Under unjust enrichment, you're entitled only to the value of your services. And there it was a spouse who had worked with her. Well, and I'm not suggesting in my question that she's going to get a contract interest. I'm suggesting she gets – why is there not at least a, if you will, a claim that can go forward as to the value of the services she gave your client? Well, that would be far preferable, but I want to make clear. I'm not talking about far preferable. I'm saying why did the district court dismiss that? It seems to me that's at least what she has if she doesn't have a contract. Well, Your Honor, first of all, she has another limitations problem. Specifically, she has performed by her account or unjustly enriched the company by her account starting in 2004 and gets nothing. And there is a two-year limitations period. So even assuming every hypothetical, and I don't want to convey the impression I would concede these points, that the most that she could get is the value of her services from 2008, in November 2008, to two years prior. Whatever it is, it's a premium. Not quite true. Not quite true. No. Not quite true. I mean, it is from the time she discovers that they will not pay her for her services. Well, Your Honor, she's been under – And if she's – if they're saying to her, oh, we're a startup company, we don't have any money yet, we're still trying to build a business and so on, wait, wait, wait, you're going to get paid, I don't know why it doesn't run from the moment that she finds out they've been lying to me because she hasn't been paying other people. Well, Your Honor, that is – she doesn't say she should have been – they were able to pay her all along. And unjust enrichment claims, she was enriching them by her allegation starting immediately and got no compensation. You can't then say – But again, you've missed his question. Answer his question. Just because she wasn't paid doesn't mean the claim runs. She is paid when she is paid. And if she would need not be paid immediately, but she should have been paid sometime, the statute may not have run. That's what his question is. Well, then we're back into another contract that doesn't – No, we're not. We're on unjust enrichment. I understand that, Your Honor. And whether the statute ought to run. The premise of the question is – You know, you really should listen. You're so anxious to talk that you really don't listen. And what that does is it'll prevent you from really answering the questions that will make a difference when we board the case. You know, I see you sitting there, you're just sort of bursting, you know, like the words have to come out of your mouth. Judge Smith is asking you questions that are going to make a difference. He's the one who's going to vote on whether or not you win or lose. Okay? So you really ought to listen to the question and think about the answer rather than say, you know, I've got a ready-made answer and I can't wait for you to stop talking, Judge, until I burst out with an answer. I mean, you spent two minutes giving a wholly irrelevant answer to his original question. I mean, he just said nothing to do with the questions. Just listen carefully. Okay? This is your job. This is your client you're serving. Yes, Your Honor. I apologize for ---- If I may, with the Chief Judge's permission, I have two other things. I'm sticking my wicket here just so I get clarification about what we're dealing with, with this morass of pleadings. There's a publicity claim that they used her likeness in her picture, and apparently they did, certainly there are allegations, that they do it to this present date, if I read it correctly. And as I understand the law, you have to have a written consent to be able to do that. Isn't that a claim also that's viable in this case? That she has a ---- that she did not give written consent? Right. I don't believe she pressed that claim in her brief, Your Honor. But if she had ---- I'm a little confused about that. Maybe your adversary can clarify that. I saw it. And if Judge Block hadn't asked you about it, I would have. So do you have an answer? Well, I think what is clear from the allegations in her complaint, Your Honor, is that she gave express consent. It doesn't matter. It has to be in ---- by State law, it has to be in writing. If that is the case, Your Honor, it would be barred by the limitations period as well, because again ---- Why? It continues to this date. The allegation is that they still are using her likeness. Every time they use a likeness, and the name is a new day. If that were the case, Your Honor, nothing before 2006, the two years or, pardon me, 2005, I believe it's three years before, would be actionable. Well, but we don't have to parse all that right now. There's continuing violation concepts. The last one I have ---- What you're saying, I gather, is that if that is the case, you're conceding that the claim was improperly dismissed, and you're quibbling about simply the scope of how the extent of the recovery. That's your full answer, right? No, Your Honor. My full answer is that I don't believe that she ---- I don't believe that they have I saw it. Assume it's in there. If Your Honor believes that it's in there, then yes, it would be ---- it would be. Okay. So you concede this to Court Erd then, that in dismissing it, you're just quibbling about how far back it goes. I want to be clear, Your Honor. I'm not conceding that. You asserted that you ---- Well, why are you not conceding it? What is your argument against that? If she has to have a written by a State law, there has to be a written permission. You know, there is no written permission. She has not alleged a written permission, so in the face of the complaint, it's not ---- it's not ---- she hasn't shown that there is a written permission. And if you, I think, have to agree that every time that they use her name and likeness, that is a violation of her right to publicity, unless there is a written permission, what basis do you have for saying that this Court did not err in dismissing the claim altogether? My threshold response, Your Honor, was that it was not sufficiently urged by my adversary. I understand you disagree with that, but I don't want to leave any ---- You think he waived it. Yes, Your Honor. Forfeited, to be precise. May I return to Judge Smith's question? Well, you've got ---- He has another question. Let him answer his question. May I ask his question? You had one other issue, didn't you, Judge? Yes, if I may. We have a claim of fraud, fraudulent misrepresentation, negligent, whatever. And I just wonder why it is that that wasn't properly pled, because as I read Rule 9b, it allows for intent knowledge, you know, that he knew it was false, bitter, or whatever the name was. Why is that not sufficient here? And I guess what I'm really trying to drive at, through on the ten seconds we have left, is that it seems that under ICBAL we may have a clash between the specificity requirements of 8b and the general pleading that's permissible when you're talking about knowledge or intent under Rule 9. How do you sort of deal with that apparent incompatibility? ICBAL is controlling, Your Honor. It says that mere allegations that a defendant had a mental state for a claim of fraud without supporting indicia and is insufficient. But does ICBAL really say that there's no longer, you know, any, you know, viability to 9b in terms of the fact that it specifically says that knowledge can be pled generally as compared to all the other elements that constitute fraud which have to comply with the specificity requirements of 8b? I'm not prepared to say that ICBAL overruled Rule 9. I think those are, those can be read. I just wonder how we mesh the two, because it puzzles me a little bit. Well, Your Honor, here there's, this is just a straight-up claim under ICBAL. The defendant, pardon me, the plaintiff has alleged simply a conclusory mental state, and the California courts are clear in saying that. We're talking about Federal pleading standard here under Federal rules. I'm sorry. Yes, Your Honor. I believe all courts that have read 9b and contract claims are clear to say you may not simply allege nonperformance of a promise as full evidence of fraud. They've alleged that he had knowledge of the falsity, and under Rule 9 it seems that that's sufficient, which allows for this type of general allegation. And I just am a little curious about that. You have an answer to Judge Smith's question? Yes, Judge Smith. We were speaking of unjust enrichment and the idea that she had been promised something, well, we can't pay you now, but we'll pay you later. And the only point I wanted to make clear was that that is, that is suggesting the addition of another agreement, a contract, that it wasn't just that she conveyed benefits and wasn't paid, which would be a classic unjust enrichment claim. That theory would presume that there was an agreement, a specific meeting of the minds to say you'll perform now, I can't afford to pay you, but I'll pay you later. And that's the only way that she could get back to 2004 with an unjust enrichment. Well, I think you've misconstrued my question. I don't necessarily believe there's another agreement. I just believe that when one has an agreement, if you'll do this, I promise, I'll give you this, just because the promise is not made at a certain time or performed in a certain time doesn't get you out of the unjust enrichment. The time for payment of the promise or for giving the promise might be longer than just immediate, but if we can't find a contract, it seems to me that it's a promise for an action which has been performed, and that's the ultimate of unjust enrichment. That's what I wanted you to talk about. I apologize, Your Honor. If the Court is inclined that the promise was not enough to reach a contract, but there is some expectation of compensation, then the correct result would be to remand with a direction for unjust enrichment, assuming there are other arguments. I have one other question. When I read Burrough, it says, in considering whether judgment on the pleadings was properly granted, only where there is an entire absence of some essential allegation, that a motion for judgment on the pleadings may be properly granted. Now, I read all these other California cases, and I appreciate I'm only an Idaho judge, not a California judge. Frankly, I'm kind of glad when I read these California cases. But California says when terms are missing, the Court can look at unusual and reasonable terms found in similar contracts. That never happened in Idaho, unless we were in a sales contract. External facts, we're going to take other evidence outside the record. That never happened in Idaho if there's no contract. Custom and reason define the time and manner of payment, the practical construction placed on it by the parties, the usage of trade or course of dealing, the community standards of fairness and policy. Applying California law, even if it's just 1%, and I don't know what it is, I've got all kinds of things I can look at. How can I dismiss this complaint? Your Honor, I would look specifically at Weddington Products, 60 Calap 4th, 793. I think you'll find it sounds a lot more like what I assume Idaho law would be. And there the Court chronicles a list, a series of cases in which there were – there was agreement on some terms, but not agreement on other terms. And the courts have held repeatedly that's not enough to state a valid cause of action for breach of contract. If the Court has no further questions.  We'll give you a minute, Mr. Lobato. Originally I had 15 seconds, and I think I can say it in that. No, you have actually – I'm sorry. I think you were on negative numbers. Yes. We'll give you a minute. What I wanted to say, I think, was echoed by the Court. Ms. Gowan worked for the company. She promoted the company. She did everything she thought she was supposed to do in this agreement. Her fate is in your hands. If you don't reverse the district court and throw the entire case out, then she will get nothing for all of her work, and you're going to allow that company to steal her likeness, her celebrity, and pay her $0. We're asking you, please do the right thing. Reverse the district court. Give her her day. Let her get to a jury and make her arguments. If she loses on summary judgment, that's another issue. But under the pleading of Iqbal, she gets there with this complaint. She has set forth facts and she's set forth causes of action under which she could recover, and we're requesting – Has there been any effort to try to settle this case? Other than the initial – I don't want to hear details. It's a good yes or no would be good. No. Does counsel think there's any chance of getting the case settled, perhaps with the help of our mediators? To be – well, based upon the communications I've received, I don't believe it could be settled at this point in time. But I don't know. Well, of course, counsel have heard a great deal today that they didn't know before. And if they thought this was going to be an easier firm, then maybe. Will she still take the $250,000? Honestly, I don't know. I would be more than – if it's on the table, I'm obligated under Nevada law to present that offer to her. But I don't know at this time. I can't say yes or no. Is your client willing to mediate? I don't know. But I will certainly suggest that to her if that's what the Court wishes. You do more than suggest. Will you affirmatively recommend? Yes. Oh, yes. If it comes from you, I honestly will bend her arm if it takes that to get her into the mediation room. Mr. Stancil, do you think there's any interest in mediating this case? Yeah, I think there would be interest in mediating it, Your Honor. I'm not authorized to state that it is, but. Well, you're all here now, and, you know, this is a good place. You know, courthouses and courthouse steps and the like are always good places to talk about such things. We have a mediation office here right on the ground floor, and if you want you can go together to a mediation office and say that judges on your panel recommended that this is a complicated case and quite possibly will go on for quite some time, and this is the kind of case that might benefit from mediation. And so I'm going to defer submission on this case until the end of the week. If I hear from either counsel or from the mediation office that there's ongoing negotiations, we will then hold off submission altogether. If I don't hear by close of business on Friday, we will hold the case submitted and decide it. Okay? But I recommend that you, since you're here, that you take what you heard today seriously and think about the advantages of putting the controversy behind yourselves and your clients. The mediation office is on the ground floor. You can go to the clerk's office and find out exactly where they are and just let our chief mediator, Claudia Bernard, know that that's what we recommend. If she's not there, one of the very fine mediators can help you out. Okay? It's all up to you. If we don't hear from you, otherwise we will hold the case submitted and we can be certain we will decide it. And I would add I wholly support my colleague in that recommendation to you. Thank you, Your Honor. As a district judge, I often had cases like this, and before we got to court, I would take them down and we'd mediate them and they were done. I heartily endorse what he's told you. Okay? Thank you. Thank you. We'll defer submission in this case until Friday and perhaps later on. Okay?
judges: Block, Kozinski, Smith N. R.